784 So.2d 666 (2001)
STATE of Louisiana
v.
Bert C. ANDERSON, III.
No. 2000 KA 1737.
Court of Appeal of Louisiana, First Circuit.
March 28, 2001.
Rehearing Denied May 1, 2001.
*670 Walter Reed, District Attorney, Covington, Dorothy Pendergast, Metairie, for Appellee, State of Louisiana.
Frank B. Bankston, Jr., Covington, for Defendant/Appellant, Bert C. Anderson, III.
Before: CARTER, C.J., FOIL, and WEIMER, JJ.
CARTER, C.J.
Defendant, Bert C. Anderson III, was charged by bill of information with operating a watercraft while under the influence of alcohol (DWI) fourth offense, a violation of LSA-R.S. 14:98. He pled not guilty and filed a motion to quash the predicate convictions. The trial court denied the motion to quash. After a trial was held, the jury returned the verdict of guilty as charged. The trial court sentenced defendant to fifteen years at hard labor, including three years to be served without benefit of parole.[1] Defendant appealed, urging five assignments of error[2] as follows:
*671 1. The trial court erred in denying defendant's motion for post verdict judgment of acquittal based upon the state's failure to prove all the elements of the offense beyond a reasonable doubt.
2. The trial court erred in finding there was no probable cause for defendant's arrest.
3. The trial court erred in denying defendant's motion to quash the predicate convictions.
4. The trial court erred in denying defendant's motion for mistrial based upon the state's improper introduction of evidence of defendant's character.
5. The trial court erred by imposing an excessive sentence.
During the late afternoon or early evening hours of June 27, 1999, Michael Bryan, a retired state trooper, and his wife were outside their home in Covington's River Forest subdivision. The home was situated on and facing Bayou Monga, which runs into the Tchefuncte River. While Mr. Bryan was on the deck and his wife was near the boathouse, he heard an outboard motor going from idle to full speed. Mr. Bryan observed a man and a woman in a wide aluminum boat with a large outboard motor at full throttle passing his home; the man was standing up and steering the boat with one hand. Mr. Bryan, who believed that the boat was moving at 30 miles per hour or faster, was concerned that the boat, if it deviated slightly, would run on the deck and kill either him or his wife. He motioned for the boat to slow down as advised by the posted signs stating "no wake, please" and "slow." Instead of slowing down defendant made a gesture with his middle finger and screamed "fuck you" to Mr. Bryan.
Fifteen minutes later defendant passed again, this time at idle speed. Mr. Bryan, intending to obtain an apology, yelled for defendant to stop. Defendant stopped and remained standing inside the boat while he and Mr. Bryan argued, using foul language and threatening to beat each other. The men were about fifteen feet apart, and Mr. Bryan noticed that the woman in the boat appeared embarrassed. According to Mr. Bryan, defendant appeared unsteady and his speech was slurred, both obvious indicators (from his personal experience and professional experience as a state policeman for over twenty years, including five years as a uniformed road trooper) that defendant had been drinking.
After the encounter, defendant drove away in the boat. Because he believed that defendant would kill someone if he continued boating, Mr. Bryan called the St. Tammany Parish Sheriff's Office. The time period between the incident and the arrival of the police was described by Mr. Bryan as being "under an hour." When Deputy Nicholas Tranchina arrived, Mr. Bryan stated he was a retired state police captain and gave the deputy information obtained from neighbors as to where they thought defendant might be that evening. Although not included in his statement to the police, Mr. Bryan mentioned to the deputy that it was obvious defendant had been drinking. As to his omissions from the statement, Mr. Bryan explained that he was not trying to record the entire incident. Mr. Bryan did, however, include language in his written statement that the "high speed erodes the pilings under my deck and dock." Also, Mr. Bryan, who denied he had been drinking, admitted he urged defendant to come on the dock to fight and told defendant that he would "whip him."
Deputy Tranchina went to the residence of Michael Rupp, defendant's friend of twenty-five years. Mr. Rupp explained to the deputy that defendant had been at his house for a cookout and during that *672 time he (defendant) and another guest, Judith Redman went for a boat ride. When defendant returned he was agitated about a confrontation with a man on the bayou. Due to defendant's ranting, the guests began leaving the Rupp residence. Mr. Rupp stated that defendant's wife drove herself and defendant to their home. The deputy drove directly to defendant's home where he arrested defendant for DWI, reckless operation of a motor vehicle, and disturbing the peace. A breath alcohol test revealed that at 8:44 p.m. defendant's alcohol level was .245%. The police interview form indicates that defendant answered "yes" to the question, "Have you been drinking?" The deputy also described the form as containing the responses "vodka" and "four shots" to the questions about the type of alcohol and the quantity that defendant had to drink.
At trial, there was conflicting testimony as to whether defendant was drinking alcohol before operating the boat. In addition to Mr. Bryan's testimony of his observations of defendant, Deputy Tranchina claimed that Mr. Rupp indicated defendant was intoxicated at the cookout. The deputy stated Mr. Rupp recalled having a cookout with several people and that about 3:30 p.m. defendant and Ms. Redman went for a boat ride. When they returned about ten minutes later, defendant was raving that a man had cursed him out for speeding. Due to defendant's mood change and language, people began leaving Mr. Rupp's home. Deputy Tranchina specifically asked Mr. Rupp if defendant was drunk or drinking, and Mr. Rupp said he had been drinking; the deputy also testified that Mr. Rupp "may have used other words on top of that." Although he did not write verbatim in his report Mr. Rupp's words about defendant, Deputy Tranchina had no doubt that when he first asked if defendant was drunk, Mr. Rupp responded affirmatively that defendant was intoxicated.
Deputy Tranchina also testified that when he arrived at defendant's home, defendant was swaying from side to side, slurring his speech, and had a strong odor of alcohol on his breath. When he stated defendant was under arrest for driving while intoxicated, defendant sneered and stated he could not have been driving his vehicle because the attached state-regulated machine would have to test his alcohol level before allowing him to start the vehicle. Deputy Tranchina told defendant his arrest was related to his operation of a boat, and defendant then said that he had "a drink" when he got home. Later, defendant expanded his explanation of the number of drinks from two drinks to two shots, and then to two double shots.
In contrast to Deputy Tranchina's testimony, Mr. Rupp said he was not asked and denied telling the police officer that defendant had been drinking; later in his testimony, Mr. Rupp admitted that he might have said that defendant was drinking out of a white cup, but he did not know the cup's contents. Mr. Rupp admitted making a comment that defendant was "F'd up" but claimed that he meant defendant's behavior about fighting with Mr. Bryan. Finally, Mr. Rupp said that he did not initially use the word drunk; he merely said defendant "was drinking and was F'd up over this ordeal with the fight. That is what I was leading to, not staggering drunk. Nobody was staggering." Mr. Rupp claimed that he had no reason to deceive or lie to the police officer, but admitted that he did not appreciate the gravity of his conversation with the deputy until later. Mr. Rupp did not hear defendant slurring or see him staggering. Mr. Rupp explained that his statement to police about defendant's response "I own the canal" when advised by Mr. Rupp of the canal's no-wake zone was not an unusual response for defendant. Defendant's normal *673 behavior is controlling, and he is quick to jump in and take control. Mr. Rupp indicated that had he not been drinking himself he would not have said that defendant was "F'd up"; he would have just indicated that defendant had gone home.
Ms. Redman knew defendant for about three and one-half years and described him as a very flamboyant character. Defendant was not acting odd, not staggering, not unsteady on his feet, not slurring words, nor was he incoherent in his speech at the time of the boat ride. Ms. Redman is cautious about water, due to almost drowning as a child, but had no apprehension about getting in the boat with defendant; she would not have gotten in if defendant had been impaired. She admitted that he was driving fast but the boat was not out of control. As indicated by Mr. Bryan, she admitted being embarrassed when the argument occurred and saying to defendant over and over again that they should leave. Ms. Redman never saw defendant pour anything into his cup and did not know what it contained.
It was defendant's custom to carry around and drink from a thirty-two ounce Styrofoam cup. Neither Mr. Rupp, Ms. Redman nor defendant's wife knew what defendant was drinking from the cup at the cookout. Mr. Rupp stated that he had beer and wine at his home that day but did not restrict what others wanted to bring to the gathering. Nor did Mr. Rupp see defendant refill his cup that day or smell alcohol on defendant's breath. He further indicated that he had not seen defendant "tipsy" since he was arrested for third-offense DWI, a year and one-half earlier.
Mr. Rupp denied telling the prosecutor that defendant had been drinking and was intoxicated at his home. Ms. Redman, who was in the same meeting, never heard Mr. Rupp say that defendant was drinking or that he was F'd up and drunk.
Linda Anderson, defendant's wife, testified that they arrived at Mr. Rupp's around 2:00 or 3:00 p.m. She explained that defendant had his cup with him, but did not know its contents. She explained that defendant carries a cup around with him and consumes liquids during the day; a lot of times he drinks water out of the cup. His alcohol of choice is vodka, but occasionally he drinks a beer or daiquiri. Mrs. Anderson did not know if defendant had consumed alcohol before the cookout.
There was also conflicting testimony at the trial as to the time that defendant was operating the boat. The state claimed that the incident occurred at approximately 6:00 p.m., the time testified to by Mr. Bryan. The police report shows that Deputy Tranchina went to Mr. Bryan's house at exactly 6:47 p.m. The deputy stated that he left there about 7:02 p.m., and arrived at the Rupp house about 7:15 or 7:30 p.m. Defendant, however, claimed that he was operating the boat around 4:00 p.m. and shortly after that time arrived home and began drinking vodka. Mr. Rupp testified that the officers came to his house around dusk, and he stated defendant had left an hour and one-half earlier. Ms. Redman explained that she arrived at Mr. Rupp's between 3:00 and 3:30 p.m. and she was certain that the boat ride occurred around 4:00 p.m., not 6:00 p.m. She recalled that the party broke up before she got to eat and that she was at her home eating at 6:00 p.m.
Mrs. Anderson, defendant's wife, said defendant and Ms. Redman returned from the ten or fifteen minute ride no later than 4:00 p.m. Defendant was angry about an encounter with someone on the bayou. Because he was using foul language around children, Mrs. Anderson told defendant that they must leave. She then drove home between 4:15 and 4:30 p.m. At *674 home, defendant, who was still angry and upset, drank vodka but did not eat.
Dr. Robert Garcia, an expert in the field of chemistry, toxicology and instrumentation, testified and explained how the intoxilizer machine measures alcohol in the breath of an individual. The machine reads the concentration of the ethanol in the air breathed in by the person. However, the amount determined has nothing to do with how the alcohol affects a person.
The doctor explained that alcohol affects every person the same way but that alcoholics do become accustomed to the effects and learn to function; they still stagger and slur, but function at higher levels than others. Blood alcohol is determined by the amount of alcohol circulating in blood, how much alcohol is absorbed in the fats in the body and how much alcohol is being metabolized. The absorption of alcohol is through the stomach instead of the intestines, a quicker absorption method. One of the reasons alcohol is put in cough syrup is to have it get into the bloodstream quicker. The reason for waiting thirty minutes after drinking to test someone after their last drink is that by then all the alcohol in the stomach is in the bloodstream. If no alcohol is consumed for thirty minutes, the initial concentration of alcohol in the bloodstream constantly rises, peaks or spikes and goes down as it is metabolized and absorbed into the body fat. Dr. Garcia further explained that within a half hour all the alcohol is into the bloodstream, there is a peak or spike (this is maximum concentration) and then a decrease due to metabolism.
As to defendant's case, the doctor knew that defendant did not have anything to drink between 8:00 p.m. and when the test was administered at 8:44 p.m. However, he acknowledged that the test does not indicate when defendant started drinking and that it could not indicate defendant's alcohol content at 6:00 p.m. or 4:00 p.m., or if defendant had a drink after those time periods.
Dr. Garcia indicated that the typical person begins to show effects when the alcohol level rises to .05; at a level of .245 a person is at the point of passing out and four to five drinks below a lethal dose. The doctor further admitted that ten ounces of alcohol would have been more than adequate for the level to rise to .245. If defendant had drunk a thirty-two ounce cup of alcohol "with a good mess of ice in it" after he arrived home, defendant definitely would have had a level of .245 in his bloodstream within half an hour.
While he had no knowledge of defendant's drinking on June 27, based upon the alcohol elimination or burn-off rate of between.015 and .022 per hour, Dr. Garcia agreed that if defendant's level of alcohol was on the downside of the peak and was.245 at 8:45 p.m., defendant would have had a level of .28 two hours earlier. However, the doctor noted that the chances were "pretty good he would be flat on the ground." He could not deny that defendant may have been consuming alcohol at the same rate per hour (.02) that it was being metabolized, and thus resulting in a blood alcohol content of .245 at 8:45 p.m. Because he did not know the rate of consumption and the amount of alcohol being consumed, he could not determine if defendant would have tested .245 at 6:00 p.m. Nor could he state that the test results cleared defendant of "the accusation that he was under the influence of alcohol at 6:00 p.m."
The only data Dr. Garcia was given was documentation that showed defendant did not have a drink after 8:00 p.m. and that the breath test results were .245 at 8:44 p.m. This result would be the peak or maximum level, but it could not be determined what the level was prior to 8:00 p.m. *675 Additionally, he acknowledged that the test would indicate more than the alcohol absorbed within the last thirty minutes; the result could have registered alcohol that entered the defendant's body even six hours before the test. Thus, the doctor agreed that the intoxilizer test result "is entirely consistent with a scenario of the defendant having consumed alcohol at 6:00 p.m."
In his testimony, Dr. Garcia testified that he had known defendant and his brother for many years. He stated he had not been paid nor requested payment for his services. Nevertheless, his relationship with defendant did not affect his testimony; he only reports data.

SUFFICIENCY OF THE EVIDENCE
In assignment of error number one, defendant argues that the trial court erred in denying defendant's motion for post verdict judgment of acquittal based upon the state's failure to prove all the elements of the offense beyond a reasonable doubt. He specifically argues that the state failed to prove that he was intoxicated at the time he was operating the watercraft. Defendant argues that the only evidence of intoxication at the time he was operating the boat was that he was speeding, was unsteady on his feet while in the boat, and his speech was slurred during the argument. He contends that his intoxicated state about two to four hours later did not prove he was intoxicated at the time he was operating the boat.
The state counters that despite the fact that defendant could have consumed alcohol between the time he arrived home and when he was arrested, there was evidence (the results of the intoxilizer test and the testimony of Mr. Bryan, Mr. Rupp and Deputy Tranchina) that supports a finding that defendant was intoxicated while driving the boat.
In reply to the state's arguments, defendant contends that the test results are meaningless and indicate his condition only at the time the deputies arrested him. He argues that under State v. Sampia, 96-1460 (La.App. 1st Cir.6/20/97), 696 So.2d 618, the general observations of Mr. Bryan were not sufficient to prove intoxication.
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). On review, the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. State v. Captville, 448 So.2d 676, 678 (La.1984). The standard has been codified in LSA-C.Cr.P. art. 821.
When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 mandates that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This statutory test is not a purely separate one from the Jackson constitutional sufficiency standard. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. State v. Graves, 95-0578, p. 7 (La.App. 1st Cir.5/10/96), 675 So.2d 1141, 1145. In order to convict an accused of driving while intoxicated, the state need only prove that the defendant was operating a motor vehicle, aircraft, or watercraft and that he was under the influence of alcohol or drugs. Graves, 675 So.2d at *676 1145. Here, there is no dispute that defendant was operating a watercraft. Thus, we are only concerned with whether the state proved defendant was under the influence of alcohol at the time he was operating the watercraft.
Intoxication, with its attendant behavioral manifestations, is an observable condition about which a witness may testify. What behavioral manifestations are sufficient to support a charge of driving while intoxicated must be determined on a case-by-case basis. Some behavioral manifestations, independent of any scientific test, are sufficient to support a charge of driving while intoxicated. Graves, 675 So.2d at 1145.
In Sampia, as in the instant case, only the element of intoxication was at issue. In Sampia, we found that the evidence clearly was insufficient to exclude the hypothesis of innocence and prove beyond a reasonable doubt that defendant operated a vehicle while intoxicated. Sampia, 696 So.2d at 621. In that case, defendant testified that at approximately 1:00 a.m. she was forced off of the roadway into a ditch by an eighteen-wheeler. After an hour, a couple stopped and Sampia called the police from the couple's cellular phone and reported the accident. Sampia returned to her apartment around 1:57 a.m., contacted a wrecker service at 4:17 a.m., and returned to the accident scene at 4:45 a.m. She testified that the empty beer cans in the car were her boyfriend's from the preceding Friday night. Sampia, 696 So.2d at 619-20.
A state trooper investigated the accident. He testified that Sampia was crying, but she was cooperative and did not appear drowsy. At trial, the trooper testified that Sampia's breath smelled of alcohol, that her voice was slurred, and that she appeared to sway slightly. Trooper Pierce stated Sampia also told him that she had nothing to drink after the accident. At 4:55 a.m., Sampia was offered a field sobriety test, which she refused. Within a minute of being placed under arrest, she agreed to take the test, but the trooper said it was too late. Sampia, 696 So.2d at 619.
Essentially, the evidence presented by the state to establish Sampia's intoxication consisted primarily of a state trooper's observations that defendant smelled of alcohol, that her speech was slurred, and that she swayed slightly. We further noted that there was nothing to contradict Sampia's testimony that the accident occurred at approximately 1:00 a.m., the trooper did not observe Sampia until almost four hours later, and that the evidence presented as to her condition at the time that she drove the vehicle was extremely meager, consisting primarily of the fact that she drove her car into a ditch. We found that the trooper's observations that Sampia's speech was slurred and that she swayed slightly were very general in nature, without giving a sense of any specific degree of impairment. Sampia's speech and the slight swaying could have been attributable to factors other than intoxication. Sampia explained that she was in a state of shock and was extremely upset when she spoke with the trooper; even he testified that Sampia was upset and crying at the time. Further, there was no testimony that the trooper saw her stagger, have difficulty walking, or appear physically impaired in any way, other than swaying slightly. In finding that the trooper's testimony (that he detected an odor of alcohol on defendant) was circumstantial or based on observations made hours after Sampia operated the vehicle, we stated:
When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, *677 that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Morrison, 582 So.2d 295, 303 (La.App. 1st Cir.1991). In this case, however, even viewing all the evidence in the light most favorable to the state, the trial court's rejection of the hypothesis of innocence contained in defendant's testimony was not reasonable. The state's evidence clearly was insufficient to exclude this hypothesis of innocence and prove beyond a reasonable doubt that defendant operated a vehicle while intoxicated. See State v. Kent, 610 So.2d 265, 267-68 (La.App. 5th Cir. 1992); City of Alexandria v. Webster, 490 So.2d 747, 749 (La.App. 3rd Cir. 1986). At best, the state's evidence is inconclusive on the issue of intoxication.
Sampia, 696 So.2d at 621.
We believe that Sampia is distinguishable from the instant matter. Herein, in addition to the testimony of Mr. Bryan about defendant's physical characteristics indicating alcohol influence, there was circumstantial evidence from defendant's own testimony and that of Mr. Rupp that defendant was drinking and intoxicated at the time he operated the boat. Thus, this is greater evidence than that presented in Sampia.
The trier of fact was free to accept or reject, in whole or in part, the testimony of any witness. State v. Gordon, 582 So.2d 285, 292 (La.App. 1st Cir. 1991). Herein, the jury's verdict indicates that, after considering the credibility of the witnesses and weighing the evidence, it accepted the officer's testimony that Mr. Rupp's and defendant's statements both referred to defendant's drinking and intoxication at the time defendant was at the Rupp residence and operating the boat. The credibility of the witnesses' testimony is a matter of weight of the evidence. The determination of the weight to be given evidence is a question of fact for the trier of fact and is not subject to appellate review. State v. Tate, 506 So.2d 546, 551 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987).
Moreover, recently in State v. Mitchell, 99-3342, pp. 7-8 (La.10/17/00), 772 So.2d 78, 83, the Louisiana Supreme Court stated:
[I]n order for a reviewing court to reverse a conviction based on an alternative hypothesis of innocence, the court must find that the jury could not have negated a potential alternative hypothesis.... For example, in this case, if the State had failed to put on evidence ... to negate the hypothesis [presented by defendant], then the reviewing court would properly have determined that the jury erred in finding that [the state did not prove the required element]. Here, the State presented evidence of the [elements of the offense] which the jury accepted. The reviewing court cannot assume a reasonable alternative hypothesis exists where the jury has heard evidence [that negates the hypothesis presented by defendant].
Herein, the state presented evidence that defendant was intoxicated at the time he operated the boat and the jury accepted this evidence. This court cannot assume a reasonable alternative hypothesis exists where the jury has heard and accepted evidence that negates the hypothesis presented by defendant (that he was not intoxicated when he operated the boat and that he became intoxicated after operating the boat). As stated in Mitchell, 772 So.2d at 83, this court "is not called upon to determine whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." Rather, this court must "assure that the *678 jurors did not speculate where the evidence is such that reasonable jurors must have a reasonable doubt" and cannot substitute our "idea of what the verdict should be for that of the jury." We cannot act as a thirteenth juror in assessing the weight to give the evidence; this is within the discretion of the trier of fact. Mitchell, 772 So.2d at 83.
Thus, we find that viewing all of the evidence in the light most favorable to the state, any rational trier of fact could have concluded beyond a reasonable doubt and to the exclusion of any reasonable hypothesis of innocence that defendant was intoxicated at the time he operated the boat and was guilty of DWI.
This assignment of error is without merit.

PROBABLE CAUSE TO ARREST
In assignment of error number two, defendant contends that the trial court erred in finding that there was probable cause to arrest him for DWI. Defendant also argues that to administer a breath test the officer must have probable cause to arrest defendant. The state contends that the defendant has not indicated how the lack of probable cause for the arrest affected his conviction and that there were ample facts to support a finding of probable cause to arrest.
Herein, defendant neither filed a motion to suppress evidence nor argues in his brief that any evidence should have been suppressed based upon this lack of probable cause. Moreover, the conviction of defendant renders moot any failure to provide a preliminary examination in the absence of any prejudice. State v. Washington, 363 So.2d 509, 510 (La.1978). Defendant has not suggested that any prejudice resulted from the failure to provide a preliminary examination.
This assignment of error lacks merit.

MOTION TO QUASH PREDICATE CONVICTIONS
In assignment of error number three, defendant argues that the trial court erred in denying his motion to quash the predicate convictions.
Defendant's three predicate convictions are as follows: 1) a 1990 counseled guilty plea in the 22nd Judicial District Court, docket no. 186,518 to DWI, first offense, 2) a 1992 counseled guilty plea in the 22nd Judicial District Court, docket no. 207,307 to DWI, second offense, and 3) a 1998 counseled guilty plea in the 22nd Judicial District Court, docket no. 274,132 F to DWI, third offense.
As to the 1990 guilty plea, defendant specifically argues that the minute entry fails to show that defendant (1) was advised of his right to counsel on appeal, (2) was advised of his right to subpoena witnesses at trial, (3) was advised of the nature of the crime, (4) was advised of the mandatory minimum and maximum sentences, (5) understood his rights, (6) was advised of his right to appeal, and (7) that the waiver of rights was voluntarily and intelligently made. He also argues that there is no transcript or guilty plea form regarding this plea. Defendant also argues that the transcript of the 1992 guilty plea fails to show that he was advised of (1) his right to appeal, (2) his right to counsel on appeal and (3) his right to subpoena witnesses at trial. As to the 1998 guilty plea, defendant argues the trial court that accepted the guilty plea failed to determine (1) that he voluntarily, knowingly and intelligently waived his rights, (2) that he was not under the influence of any substance at the time of the plea, and (3) that he was advised of the mandatory minimum *679 and maximum sentences. He further argues that there is no verbatim record of the plea as required by LSA-C.Cr.P. art. 556.1.
The state argues that defendant's motion only sought to quash the 1990 and 1992 guilty pleas and did not raise arguments as to the 1998 guilty plea. A review of defendant's motion to quash and memorandum in support of this motion reveals, as argued by the state, that defendant did not seek to quash the 1998 guilty plea. Nevertheless, the trial court, in its ruling after taking the motion under advisement, found all three predicate convictions to be adequate.
In State v. Carlos, 98-1366, pp. 6-7 (La.7/7/99), 738 So.2d 556, 559, the Louisiana Supreme Court held that the burden-shifting principles established in State v. Shelton, 621 So.2d 769 (La.1993), are applicable to the recidivist provisions of the DWI statute. The court stated:
In Shelton, this Court recognized that Boykin does not require that the entire burden be placed on the prosecution in a recidivism proceeding. 621 So.2d at 779 (relying on Parke [v. Raley], 506 U.S. [20] at 34, 113 S.Ct. [517] at 525-26[, 121 L.Ed.2d 391 (1992)]). Rather, the presumption of regularity that attaches to prior convictions encouraged us to revisit our previous system of placing the entire burden on the State to prove the validity of prior convictions. Id. Consequently, we held that when a defendant denies the allegations contained in the bill of information in an habitual offender proceeding, the burden is on the State to prove the existence of the prior guilty pleas and that the defendant was represented by counsel when they were taken. Id. If the State meets this initial burden, the defendant must produce affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. Id. If the defendant carries this burden, then the burden reverts to the State to prove the constitutionality of the plea. Id. The State will meet this burden by producing a "perfect" transcript of the guilty plea colloquy. Anything less than a "perfect" transcript, such as a guilty plea form or minute entry, will require the trial judge to weigh the evidence submitted by both sides and determine whether the defendant's Boykin rights were prejudiced. In Shelton, we held that the State carried its initial burden under the revised burden-shifting rules by producing a well-executed guilty plea/waiver of rights form and a minute entry which stated, inter alia, that the judge "gave the Defendant his rights." Id. at 770, 780.
(Footnotes omitted.)
In order for a misdemeanor guilty plea to be used as a basis for actual imprisonment, enhancement of actual imprisonment, or conversion of a subsequent misdemeanor into a felony, the trial court must inform the defendant that by pleading guilty he waives (a) his privilege against compulsory self-incrimination, (b) his right to trial and jury trial where it is applicable, and (c) his right to confront his accuser. The trial judge must also ascertain that the accused understands what the plea connotes and its consequences. State v. Jones, 404 So.2d 1192, 1198-99 (La.1981). It is the state's burden to show that the defendant's plea was taken in compliance with Boykin's requirement that the defendant expressly and knowingly waived his rights. The scope of Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), has not been expanded to include advising the defendant of any other rights (beyond the right against self-incrimination, right to jury trial, and right to confrontation) that he may have (such *680 as the right to appeal), nor of the possible consequences of his actions. Additionally, contrary to defendant's assertions, there is no requirement that a defendant be informed by a court, prior to the court's acceptance of a guilty plea, of the penalty range for the offense and that such a plea may be used as a predicate in a future enhancement proceeding. See State v. Longo, 560 So.2d 530, 532 (La.App. 1st Cir.1990); State v. Nuccio, 454 So.2d 93, 104 (La.1984). In State v. Anderson, 98-2977 (La.3/19/99), 732 So.2d 517 (per curiam), the supreme court stated that advice with respect to the defendant's sentencing exposure has never formed part of the core Boykin requirements for the entry of a presumptively valid guilty plea in any case. Thus, this argument lacks merit.
In State v. Farmer, 612 So.2d 801, 802-03 (La.App. 1st Cir.1992), we addressed and rejected defendant's argument that at the time of the counseled plea the district court erroneously failed to advise him of the essential elements of the crime. We stated:

Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), requires that a trial court ascertain before accepting a guilty plea that the defendant has voluntarily and knowingly waived his right against self-incrimination, his right to jury trial, and his right to confrontation. A plea cannot be considered voluntary unless the defendant has notice of the essential nature of the charge against him. See State ex rel. Halvorsen v. Blackburn, 388 So.2d 806, 807 (La.1980). However, it is not essential to the validity of a guilty plea that the trial court specifically inform the defendant of every element of the charged offense. Rather, the defendant must establish that his lack of knowledge regarding the essential elements of the offense resulted in his unawareness of the essential nature of the offense to which he pled guilty. State v. Hall, 537 So.2d 321, 322 (La.App. 1st Cir.1988); State v. Fabre, 525 So.2d [1222] at 1224 [(La.App. 1st Cir.), writ denied, 532 So.2d 148 (La.1988)]. In State ex rel. Halvorsen, 388 So.2d at 807, the Louisiana Supreme Court refused to set aside a guilty plea because of the failure of the record to affirmatively establish that the defendant was given notice of an essential element of the offense to which he pled guilty. The Court held that, while it might be preferable for the trial court to explain the elements of the charged offense, the due process requirement of notice could be satisfied from other sources. State ex rel. Halvorsen v. Blackburn, 388 So.2d at 807.
Additionally, defendant was represented by counsel at the time of his three predicate guilty pleas. In State v. Ladner, 619 So.2d 1144, 1147 (La.App. 1st Cir.), writ denied, 625 So.2d 1059 (La.1993), we addressed a defendant's right to counsel, and waiver of this right, as follows:
In the instant case, the defendant admits that he was represented by counsel when he entered these two predicate guilty pleas. However, he raises the apparently novel argument that every defendant who decides to enter a guilty plea must be informed of the right to counsel, including the right to court-appointed counsel for indigents, even if he already is represented by counsel. The defendant specifically argues that he should have been informed of "the right to a court appointed [sic] attorney for purposes of appeal should appellant had [sic] elected to go to trial." Yet, the defendant has not cited, nor have we discovered, any authority for such a proposition. Furthermore, in his collateral attack upon the validity of these two *681 predicate guilty pleas, the defendant does not now allege that he actually was indigent when he entered these guilty pleas, that he might have been indigent at some point during or after trial (thus entitling him to court-appointed counsel on appeal), or that he might not have pleaded guilty to these predicate offenses if he had been informed of the right to court-appointed counsel if he was indigent. Accordingly, noting that the defendant was represented by counsel when he entered these two prior guilty pleas, we find no merit to his argument that these predicate convictions were rendered invalid for future enhancement purposes simply because the trial court did not inform him of the right to court-appointed counsel.
(Footnote omitted.) Thus, there was no error in the trial court's failure to advise defendant as to his right to counsel on appeal.
Finally, as to defendant's argument regarding the lack of a verbatim record of the guilty plea as required by LSA-C.Cr.P. art. 556.1, we note that under Carlos the state was not required to submit transcripts of the guilty pleas in its initial burden of proof. Furthermore, we have found (in situations where Article 556.1 is applicable and the trial court has failed to properly advise a defendant) that because the omissions complained of are statutory requirements rather than constitutional requirements (as is the requirement that the trial court inform the defendant of the three Boykin rights), the error, if any, was harmless. See State v. Phillips, 99-1629, p. 4 (La.App. 1st Cir.5/12/00) 762 So.2d 172, 174.
Because the state introduced the minute entries of the guilty pleas (and the transcript of the 1992 guilty plea) that prove the existence of each predicate conviction, the state met its initial burden of proof under Carlos. Defendant then had to produce affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the pleas. He has not done so. The documentation shows that defendant was represented by counsel, was advised of the three Boykin rights and knowingly and intelligently waived his rights at the time of each plea. Thus, we find no error in the trial court's denial of the motion to quash.
This assignment of error lacks merit.

EVIDENCE OF DEFENDANT'S PRIOR INTOXICATED CONDITION
In assignment of error number four, defendant contends that the trial court erred in denying his motion for mistrial based on inadmissible testimony of defendant's character under Louisiana Code of Evidence article 404. The state argues that this testimony about defendant's intoxicated condition on a prior occasion was not the type of character evidence contemplated by Article 404. Defendant replies that this evidence was used to establish a pattern of intoxication and was irrelevant, inflammatory and prejudicial.
During Mr. Bryan's testimony, he said he saw defendant intoxicated at a homeowners' meeting. After defendant objected, the trial court ruled that because it was not clear as to which occasion (homeowner's meeting or on the boat) Mr. Bryan was referring, Article 404 did not apply. The trial court then admonished the jury to disregard the witness's response and sustained the objection. Mr. Bryan continued testifying and indicated that defendant's physical appearance while in the boat differed little from that at the homeowners' meeting. Mr. Bryan explained that at the time of the boating incident, he was not close enough to defendant to smell alcohol on his breath. However, at *682 the homeowners' meeting, Mr. Bryan was close enough to defendant to smell alcohol on his breath and to observe his actions and demeanor, and he described defendant as making a spectacle of himself by walking closely up to others and demanding that they sign a petition. Defendant objected again and moved for a mistrial. The trial court concluded that the witness went too far into what occurred at the meeting and sustained the objection, but denied the motion for mistrial. The court then removed the jury and instructed Mr. Bryan not to refer to the homeowners' meeting.
Louisiana Code of Criminal Procedure article 771 provides, in pertinent part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
. . . . .
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
Herein, the questioned remark was made by a state witness, Mr. Bryan. A mistrial under the provisions of LSA-C.Cr.P. art. 771 is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. Moreover, mistrial is a drastic remedy that is authorized only where substantial prejudice will otherwise result to the accused. State v. Burdgess, 434 So.2d 1062, 1065 (La.1983). Unsolicited and unresponsive testimony is not chargeable against the state to provide a ground for mandatory reversal of a conviction. State v. Jack, 554 So.2d 1292, 1296 (La.App. 1st Cir.1989), writ denied, 560 So.2d 20 (La.1990). Furthermore, a statement is not chargeable to the state solely because it was in direct response to questioning by the prosecutor. State v. Ondek, 584 So.2d 282, 296 (La.App. 1st Cir.), writ denied, 586 So.2d 539 (La.1991). Finally, while a prosecutor might have more precisely formulated the question that provoked a witness's response, where the remark was not deliberately obtained by the prosecutor to prejudice the rights of defendant, it is not the basis for a mistrial. See State v. Feet, 481 So.2d 667, 673 (La.App. 1st Cir.1985), writ denied, 484 So.2d 668 (La.1986).
Louisiana Code of Evidence article 404 provides in pertinent part:
A. Character evidence generally. Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
(1) Character of accused. Evidence of a pertinent trait of his character, such as a moral quality, offered by an accused, or by the prosecution to rebut the character evidence; provided that such evidence shall be restricted to showing those moral qualities pertinent to the crime with which he is charged, and that character evidence cannot destroy conclusive evidence of guilt.
. . . . .

*683 B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Louisiana Code of Evidence article 405 provides:
A. Reputation. Except as provided in Article 412, in all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to general reputation only. On cross-examination of the character witness, inquiry is allowable into relevant specific instances of conduct.
B. Specific instances of conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, such as in a prosecution for defamation or when there is a defense of entrapment, proof may also be made of specific instances of his conduct.
C. Foundation. Before a person may be permitted to testify to the reputation of another person, a foundation must be established that the witness is familiar with that reputation.
Louisiana Code of Evidence article 404 generally disallows admission of evidence of a person's character or a trait of his character for the purpose of proving he acted in conformity therewith on a particular occasion. However, as a limited exception to the general rule, Article 404A(1) allows admission of evidence of a pertinent trait of an accused's character, such as a moral quality, offered by him or by the prosecution to rebut the character evidence. For this exception to apply, the requirements of LSA-C.E. art. 405 also must be met. Generally, Article 405 allows a party to prove a person's character with testimony as to "general reputation" only, and a particular foundation is required. LSA-C.E. art. 405A & C. See State v. Martin, 582 So.2d 306, 314-15 n. 4 (La.App. 1st Cir.), writ denied, 588 So.2d 113 (La.1991).
In this case, the evidence does not fit within the parameters of the exceptions to Article 404 because it was not offered by the state to rebut character evidence by the defendant. Furthermore, the testimony of Mr. Bryan referred to a specific instance of conduct and not a pertinent trait of defendant's character provable by testimony as to general reputation only. Thus, the testimony sought to be introduced was not admissible under La.Code Evid. art. 404A(1).
The state argued in brief that the evidence of Mr. Bryan's observations of defendant's intoxicated state on a prior occasion (at the homeowners' meeting) was relevant and admissible to show Mr. Bryan's ability to determine defendant's condition when he saw him in the boat. In any event, the trial judge admonished the jury to disregard Mr. Bryan's initial testimony about defendant's condition at the homeowners' meeting and ultimately prevented Mr. Bryan from continuing to testify about defendant's condition on that occasion. Thus, there was no prejudice warranting a mistrial.
*684 Therefore, this assignment of error lacks merit.

EXCESSIVENESS OF THE SENTENCE
In assignment of error number five, defendant contends that the trial court erred in denying his motion to reconsider sentence based upon excessiveness. Here, defendant merely argues that the evidence was insufficient to support the conviction. The state refers to the presentence investigation report (PSI) and the trial court's reasons for the sentence and argues that the sentence is not grossly disproportionate.
The trial court has wide discretion in imposition of a sentence within statutory limits. State v. Lanclos, 419 So.2d 475, 478 (La.1982). Given compliance with the sentencing criteria of LSA-C.Cr.P. art. 894.1, the sentence imposed will not be set aside in the absence of manifest abuse of discretion. Generally a sentence is considered excessive if it is grossly disproportionate to the severity of the crime or is nothing more than the needless imposition of pain and suffering. A sentence is considered grossly disproportionate if one's sense of justice is shocked when comparing the punishment imposed to the crime committed, in light of the harm done to society. See State v. Edwards, 591 So.2d 748, 756 (La.App. 1st Cir.1991), writ denied, 94-0452 (La.6/21/96), 675 So.2d 1072.
Louisiana Revised Statute 14:98E(1) provides that for a fourth-offense DWI conviction, a sentence of not less than ten years and not more than thirty years shall be imposed. Herein, the trial court imposed a sentence of fifteen years at hard labor, including three years without benefit of parole. This sentence is five years more than the minimum sentence and fifteen years less than the maximum sentence.
In imposing the sentence, the trial judge noted that defendant's PSI indicates that in addition to his three predicate DWI convictions, defendant had convictions for simple battery on a police officer and illegal use of a weapon, and had numerous arrests for offenses including two DWIs, disturbing the peace by being drunk, appearing in an intoxicated state, possession of marijuana, and simple assault. The judge found that there was an undue risk and probability that during a period of probation defendant would commit another crime, that defendant needed correctional treatment and a custodial environment and that a lesser sentence would deprecate the seriousness of the crime. The judge also noted the mitigating circumstances of defendant's employment and that imprisonment at hard labor would be a hardship to defendant's family. However, the judge noted that defendant "should have realized [the consequences] when he continued in his drinking problem." The PSI concludes that defendant's rationalization and denial (as is shown by defendant's statement to the probation officer that he believed the charge was wrong and that his conviction would be overturned) indicate that he does not comprehend the serious consequences related to his offense.
As to the length of the sentence, this court has found a sentence of twenty-four years for a conviction of fourth-offense DWI not to be excessive. See Edwards, 591 So.2d at 757. Herein, we find that the sentence was not grossly disproportionate to the crime nor the needless imposition of pain and suffering. Considering the reasons given by the trial court, defendant's prior DWI convictions and other criminal history, we cannot say that the sentence *685 imposed is excessive or an abuse of the trial court's discretion.
This assignment of error lacks merit.

ERROR PATENT
We note an error patent in the sentencing of defendant. The trial court failed to impose the mandatory fine for a conviction of fourth-offense DWI. Louisiana Revised Statute 14:98E(1) states in pertinent part that "the offender shall be sentenced to imprisonment at hard labor for not less than ten nor more than thirty years, and shall be fined five thousand dollars." Nevertheless, because the sentence imposed was illegally lenient and the state has not appealed, filed an application for review of an illegal sentence, or filed a motion for reconsideration of sentence, we cannot correct the sentence. See LSA-C.Cr.P. arts. 881.1D and 882B; State v. Williams, 98-0952, p. 5 (La.App. 1st Cir.2/19/99), 729 So.2d 1080, 1082.

CONCLUSION
For these reasons, the defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] See Error Patent discussion.
[2] The assignments of error presented in defendant's brief differ from those filed into the record. Defendant's notice of assignments of error lists seven assignments of error; five assignments of error are raised in defendant's brief. Because assignments of error not briefed are considered abandoned, we address only those assignments argued in the brief. Uniform Rules-Courts of Appeal, Rule 2-12.4.