839 So.2d 455 (2003)
STATE of Louisiana
v.
Timothy L. BOOKER.
No. 2002 KA 1269.
Court of Appeal of Louisiana, First Circuit.
February 14, 2003.
Rehearing Denied March 24, 2003.
*457 Walter P. Reed, Office of District Attorney, Covington, By Dorothy Pendergast, Metairie, Counsel for Plaintiff/Appellee, State of Louisiana.
Frank Sloan, Mandeville, Counsel for Defendant/Appellant, Timothy L. Booker.
Before: PARRO, MCDONALD, and CLAIBORNE[1], JJ.
MCDONALD, J.
The defendant, Timothy Booker, was charged by grand jury indictment with the second degree murder of Chantell Duncan, in violation of La. R.S. 14:30.1.[2] He pled not guilty. Following a jury trial, the defendant was convicted as charged. The *458 defendant moved for post verdict judgment of acquittal and alternatively, for a new trial. The trial court denied the motions. The defendant subsequently was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The defendant now appeals, urging eight assignments of error as follows:
1. The evidence was insufficient to support the verdict of second degree murder.
2. The trial court erred in permitting the state to circumvent the provisions of Art. 404B of the Code of Evidence by amending the indictment to include the entire life of the victim.
3. The trial court erred in permitting highly prejudicial evidence of prior abuse and neglect.
4. The trial court erred in permitting the jury to see autopsy photographs of the victim.
5. The trial court erred in overruling a defense objection to the opening statement of the prosecutor.
6. The trial court erred in charging the jury on what constitutes second degree murder resulting from cruelty to a juvenile.
7. La. R.S. 14:30.1 does not apply to this defendant for neglect of the victim.
8. The errors complained of are not harmless beyond a reasonable doubt.
For the reasons set forth below, we affirm.

FACTS
Kenisha Duncan and her four-year old daughter, Chantell Duncan, lived in an old, dilapidated caretaker's cottage with the defendant, Timothy Booker. The cottage was located adjacent to a larger home (the main house) on a piece of property on Riverside Drive in Covington. On the cold and rainy winter morning of December 18, 2000, Kenisha called 911 and requested emergency medical assistance for Chantell. St. Tammany Parish Fire District responded to the call. Upon arriving at the Riverside property, the paramedics found Chantell lying in a bed inside the main house, clad in a sleeveless top and shorts. The child had no pulse or respiration and was extremely cold to the touch. The paramedics immediately began administering cardio-pulmonary resuscitation (CPR). Chantell was subsequently transported, by ambulance, to the St. Tammany Parish Hospital where emergency room physicians continued the resuscitation efforts. The doctors also worked to raise the child's body temperature, which was down to approximately 80 degrees. Once Chantell was successfully resuscitated, she was transported to Children's Hospital in New Orleans for intensive care. Despite all efforts to save her, Chantell died several hours later. An autopsy report and death certificate listed hypothermia, battered child syndrome, and malnourishment as the causes of Chantell's death.

ASSIGNMENT OF ERROR 1
In his first assignment of error, the defendant asserts the evidence presented at trial was insufficient to support the second-degree murder conviction. Specifically, defendant argues that the state failed to prove that he caused or contributed to the victim's death from hypothermia.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La.C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988).
*459 When analyzing circumstantial evidence, La. R.S. 15:438 provides, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This statutory test is not a purely separate one from the Jackson constitutional sufficiency standard. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Shanks, 97-1885, pp. 3-4 (La.App. 1st Cir.6/29/98), 715 So.2d 157, 159.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471, 474 (La.1983); State v. Lott, 535 So.2d 963, 966 (La.App. 2nd Cir.1988).
La. R.S. 14:30.1 defines second degree murder as follows:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

* * *
(2)(b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.
Cruelty to juveniles is defined in La. R.S. 14:93(A) as the "intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child." The term "intentional" as used in La. R.S. 14:93 refers to general criminal intent to mistreat or neglect and does not require an intent to cause the child unjustifiable pain and suffering. State v. Morrison, 582 So.2d 295, 302 (La.App. 1st Cir.1991). "Mistreatment" as used in this statute is equated with "abuse." State v. Comeaux, 319 So.2d 897, 899 (La.1975). Criminally negligent mistreatment or neglect of the juvenile exists when, although neither specific nor general intent is present, there is such disregard of the interest of the juvenile that the defendant's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. State v. Morrison, supra at 302; La. R.S. 14:12.
Thus, in order to convict the defendant of second degree murder where the killing occurred during the perpetration of cruelty to a juvenile, the state was required to prove either that (1) the defendant intentionally abused or neglected Chantell, resulting in the infliction of unjustifiable pain or suffering, and ultimately, death; or (2) that the defendant's abuse or neglect of Chantell was criminal negligence that caused the infliction of unjustifiable pain or suffering, and finally, her death. La. R.S. 14:30.1(A)(2)(b).
In this case, the state presented testimony of Dr. Scott Benton, the medical director of the Children at Risk Evaluation Center at Children's Hospital. Dr. Benton testified that on December 18, 2000, Chantell arrived at Children's Hospital in critical condition. She was in a comatose state, had significant blood loss, the acidity of her blood was dangerously high, and her *460 core body temperature was very low (approximately 84 degrees). Dr. Benton noted that because her systems were not functioning properly, Chantell had a significant amount of swelling in her abdomen, legs, feet, hands and face. Dr. Benton also noted that the child had poor hygiene. She was very dirty, had foreign matter in her hair, and reeked of a foul body odor. Dr. Benton testified that Chantell also appeared significantly malnourished. He explained that there was no fat beneath her skin surfaces and her height and weight were well below the 5th percentile on a growth chart for a child of her age.
Dr. Benton also noted numerous visible injuries to Chantell's body, which he opined could have only resulted from abuse. Dr. Benton testified that Chantell had extensive bruising and scarring on her face, trunk, abdomen, arms, wrists, and legs. She had numerous looped or semicircle type scars over her entire body. Some of the scars were fresh, some were healing and some had already healed. Dr. Benton testified that, in his medical opinion, these looped or semicircle type scars are typically the result of the child being hit on the skin with an extension cord or similar object.
Dr. Benton also noted ligatured or encircling cuts around Chantell's wrists. He testified that ligature markings on the wrists usually occur when something used to abusively restrain the arm cuts into the skin. Dr. Benton opined that these ligature markings were recent injuries because there was fresh blood dried over them. Evidence of older ligature scarring was also present on the child's wrists and ankles.
Dr. Benton further testified that x-rays revealed several fractures in Chantell's hand and foot. From the x-rays, Dr. Benton also noted a twisting or grabbing-type injury to Chantell's right arm. Dr. Benton explained that this type of injury occurs when the layer of muscle covering the bone is painfully stripped away. According to Dr. Benton, "the only thing that causes this particular pattern of injury is a grip around the muscle where there's shear forces going around the bone."
Dr. Benton testified that most of the injuries found on Chantell's body were intentionally inflicted, abusive injuries. Dr. Benton further testified that Chantell's condition, particularly the fresh lesions on her body, clearly indicated that the child had suffered a great deal of pain prior to her death.
Lieutenant Jimmy Richard of the St. Tammany Parish Sheriff's Office testified that he observed the victim's physical condition at St. Tammany Parish Hospital. Lieutenant Richard testified that the child had marks around her wrists, loop-type scars and sores over her entire body, and a contusion on her forehead. Lieutenant Richard further testified that although it was freezing outside that morning, Chantell wore only a sleeveless shirt and shorts.
After observing Chantell's physical condition and speaking with Kenisha Duncan, Lieutenant Richard secured search warrants and returned to the Riverside Drive property to investigate. Although the child was originally found inside the main house, Lieutenant Richard subsequently learned that the child actually became ill in the small cottage. In searching the cottage, Lieutenant Richard observed numerous small plastic/wire ties on the floor. He testified that although many of the ties had been cut, they remained in a small semicircular shape.
Lieutenant Richard also testified regarding the deplorable condition of the house. He stated that the entire house was covered in dishes, pots, rusted cans, and other trash. There was a large hole in *461 the ceiling of one of the bedrooms that extended through the roof, allowing cold air, rain and other debris to enter the house. There was no evidence that anyone slept in that room. A door inside the room led to the bathroom. There was also another door, on the other side of the bathroom, which led to another bedroom. Lieutenant Richard noted that the door between the room with the hole in the ceiling and the bathroom was broken and could not close completely. The door of the other room had a lock on the bedroom side, which could be used to lock the bathroom from the outside.
Lieutenant Richard testified that there was a musky odor and dampness throughout the house. The dampness trapped inside the house made it feel colder inside than it was outside. He stated that throughout the investigation he would walk outside at times "to warm up." Lieutenant Richard additionally testified that a report from the National Weather Service indicated that the outside temperature on the night before the child's death dropped to at least 29 degrees.
Detectives Jobeth Rickels and Earl Clark, of the St. Tammany Parish Sheriff's Office, Juvenile Division, also testified at the trial. Detective Rickels indicated that upon learning of the child's physical condition at the hospital, she and Detective Clark went to the Riverside property to speak with the defendant. Detective Rickels testified that in response to questioning, the defendant indicated Chantell and Kenisha had spent the night in the main house, while he spent the night out with friends. Detective Rickels testified that the defendant told her that Kenisha and Chantell lived with him, but they usually stayed at the big house. The defendant stated that when he returned home (to the main house) that morning, he went to check on Chantell because he heard her hollering. According to the defendant, when he found Chantell and observed her condition, he instructed Kenisha to call for help. The defendant stated that he administered CPR until the medical personnel arrived. Upon the defendant's request, Detective Rickels recorded the defendant's statement in written form. She then read the statement back to the defendant and he signed it. This written statement was introduced into evidence at trial. (State's Exhibit # 56).
Detective Clark testified that he also questioned the defendant in conjunction with the investigation of this matter. Detective Clark testified that in response to questioning, the defendant admitted that he had, on occasion, restrained and physically disciplined Chantell. The defendant told Detective Clark that he had also used corporal punishment to discipline Chantell. The defendant stated that he had hit Chantell with a yardstick, a bamboo switch and sometimes a belt. The defendant told Det. Clark that he had physically disciplined Chantell three or four days prior to her death, when she was caught drinking water from the toilet. The defendant explained that the child drank from the toilet because she was not allowed in the kitchen. The defendant also admitted that he had, on occasion, held Chantell by her left upper arm while whipping her. Det. Clark testified that the defendant also stated that he sometimes used plastic/wire twist ties to restrain Chantell. According to Detective Clark, the defendant explained that when he restrained Chantell he used three twist ties, one on each of her wrists and one to connect the two wrists together.
The state also presented medical testimony from Dr. Michael DeFatta, Chief Deputy Coroner for St. Tammany Parish. Dr. DeFatta performed an autopsy on Chantell's body on December 19, 2000.
*462 Dr. DeFatta testified that at the time of the autopsy, the four-year-old child weighed roughly 25 pounds and was thirty-five inches in height. For a child her age, Chantell's height and weight were well below the 5th percentile on a growth chart. Dr. DeFatta testified that this indicated significant growth stunting and malnourishment. As further evidence of malnourishment, Dr. DeFatta testified that upon internal examination, he noticed that Chantell had minimum fat in the abdominal area, which indicates "a very low nutrition state or malnourished state."
Like Dr. Benton, Dr. DeFatta also testified regarding Chantell's physical condition at the time of death. Dr. DeFatta testified that Chantell had numerous abrasions, lacerations, bruises, and scars over her entire body. These injuries were noted as being in various stages of healing, some were recent and some old. In some areas of Chantell's body there was evidence of recent injuries on top of older healed injuries. Dr. DeFatta also observed the ligature marks around Chantell's wrists and ankles, which, he opined, suggested that the child had been bound. Dr. DeFatta further testified that the position of bruising on the lateral portion of Chantell's body indicates that her arms were likely held back over her head or held back during some of the beatings. Scratches near the ligature marks on Chantell's wrist indicate that the child struggled to free herself from the bindings. Chantell also had areas of recent bruising to her forehead. A reflection of Chantell's scalp revealed recent head trauma. There was extensive hemorrhaging beneath the scalp surface covering the right side of Chantell's head. This type of injury is consistent with multiple blunt traumas over the entire right side of her head. Dr. DeFatta also testified that this type of hemorrhaging could possibly result from painfully pulling the hair in that area. Dr. DeFatta noted that at the time of the autopsy, a large portion of Chantell's hair was missing from her scalp in this area. Dr. DeFatta further testified that the force from these injuries, certainly the blows, could have easily caused unconsciousness or concussion.
Dr. DeFatta defined hypothermia as the decreased core body temperature. He indicated that the medical reports indicate Chantell's core body temperature upon initial examination on December 18, 2000, was recorded in the low 80's. He testified over objection that in his opinion the hypothermia that caused Chantell's death occurred for one of three reasons: she was tied up so that she could not get out of the cold, she was unconscious because of the blows to her head, or she was locked in the cold bathroom, otherwise she would have sought warmth. He explained that the severe physical injuries to Chantell's bodythe scars, the healing injuries, and the recent injurieswhen observed together are defined as Battered Child Syndrome. Children suffering from this syndrome are typically undergoing neglect, he said, and especially in this case, obviously abuse and torture. Dr. DeFatta opined, "[t]his child certainly didn't have a chance to survive the cold temperatures in her badly beaten and malnourished state."
The defendant testified on his own behalf at trial. Regarding his previous statement indicating that he spent the night out with friends, the defendant admitted, under oath, that this statement was not true. He also confessed to having provided false information to the investigating detectives when he told them that Chantell and Kenisha spent the night in the main house. The defendant testified that on the night before Chantell's death, he was home (at the cottage), with Kenisha and Chantell. He testified that he worked outside repairing a vehicle all night. The defendant *463 testified that at some point during the night, he entered the house and found Kenisha asleep in the living room and Chantell awake in the bedroom. He stated that heaters were on in the living room and the bathroom. The defendant testified that the next time he entered the house, at approximately 7:00 a.m., he found Chantell lying on the bedroom floor in a fetal position. He stated that the child was moaning and "wasn't breathing real well." The defendant testified that Chantell's clothing was wet, like she had been getting water from the toilet. The defendant testified that he removed the wet clothing from the child's body, took her into the living room, placed her in front of the heater, and began CPR.
During his testimony, the defendant admitted that he physically disciplined Chantell. However, he claimed to have only "spanked" her with his hand, "popped" her in her hands with a twelve-inch ruler, or "popped" her on her buttocks with a belt. The defendant denied ever telling Detective Clark that he hit Chantell with a bamboo pole. Consistent with his prior statement given to Detective Rickels, the defendant testified that the most recent episode of physical discipline was only four days prior to Chantell's death, when he hit Chantell for drinking water from the toilet. The defendant stated that Chantell sometimes drank water from the toilet because she was not allowed in the kitchen. The defendant denied ever seeing Kenisha beat Chantell with anything that would have caused the bruises and scars on the child's body. The defendant acknowledged that he used plastic, "garbage bag tie like" objects as restraints to prevent Chantell from climbing. He stated that he placed the ties on Chantell's wrists loosely, and only left them in place for up to 35 minutes. The defendant claimed he never left the room while Chantell was restrained. When questioned regarding the extensive bruising and scarring on Chantell's body, the defendant testified that he never saw these injuries. He stated that because Chantell often wore his shirts, which were extremely large, he was never really able to observe the child's body. Contrary to medical testimony indicating that Chantell was significantly malnourished, the defendant testified that he often fed, and sometimes even "overfed" Chantell, "because [he] knew she liked to eat."
When viewing the evidence presented at trial in the light most favorable to the prosecution, we are convinced that any rational trier of fact could have concluded beyond a reasonable doubt that all of the elements of the crime of second degree murder were sufficiently proven. The evidence clearly established that Chantell was severely abused and neglected throughout her life. The four-year-old child was bound, beaten, and deprived of food. Although the immediate cause of Chantell's death was listed as hypothermia, the secondary causes listed were Battered Child Syndrome and malnourishment. Medical testimony at trial clearly indicated that the child's weakened physical condition, which was due to malnourishment and Battered Child Syndrome, hastened her death. The medical testimony presented at trial, particularly the testimony indicating the existence of fresh or recent abusive wounds and/or ligature markings, some of which were only hours old, reasonably supports the conclusion that Chantell was beaten severely, possibly rendered unconscious, tied up, and left in an unheated room prior to her death. Viewing all of this evidence, together with the defendant's statements to the investigating detectives and his trial testimony, wherein he admitted that he occasionally and intentionally struck Chantell with various objects, grabbed and/or held her left upper arm while striking her, and placed plastic twist-ties *464 around her wrists to restrain her, any rational trier of fact could have concluded beyond a reasonable doubt that the defendant was engaged in cruelty to a juvenile. Moreover, based upon the defendant's untruthfulness during the investigation of the offense, it would not have been unreasonable for the jury to find that he was not credible. From the defendant's dishonesty when he claimed that he was not at home on the night Chantell froze to death, an inference of a "guilty mind" can be drawn. State v. Mitchell, 99-3342, pp. 10-11 (La.10/17/00), 772 So.2d 78, 85.
Considering the foregoing, we find that the evidence presented at the trial of this matter clearly supports a finding that the defendant committed cruelty to Chantell, a juvenile, which ultimately resulted in her death. This assignment of error lacks merit.

ASSIGNMENT OF ERROR 2
In his second assignment of error, the defendant contends the trial court erred in allowing the state to amend the indictment to provide that the crime occurred between "12/17/96 and 12/18/2000". The defendant argues that by allowing this amendment, the trial court erroneously allowed the state to circumvent the notice requirements for use of other crimes evidence as set forth in La.Code Evid. art. 404(B).
The original indictment, charging the defendant with second degree murder, listed the date of the offense as December 19, 2000. Prior to trial, the state amended the indictment to reflect the dates of the alleged cruelty to a juvenile, which formed the predicate for the second degree murder indictment. The amended indictment provided that the offense occurred "between 12/17/96 and 12/18/2000," the entire life of the victim. Following this amendment, the defendant moved to quash the indictment or to strike the amendment, arguing that such amendment was highly prejudicial and violative of the defendant's state and federal due process rights. The trial court denied the motion to quash, finding that the state could properly amend the indictment as to the date of the offense, as this was not an essential element of the crime charged.
The actual date the offense is alleged to have occurred is not an essential element of the offense of second degree murder. La. R.S. 14:30.1. Defendant actually asserts that the "trial court erred in permitting the state to circumvent the provisions of Art. 404 B of the Code of Evidence by amending the indictment to include the entire life of the victim." In this case the State was attempting to prove that the murder occurred when the offender was engaged in the perpetration of cruelty to a juvenile in accordance with La. R.S. 14:30.1(A)(2)(b). On September 26, 2001 the assistant district attorney wrote to defense counsel advising that the indictment was amended to include "the dates of the alleged cruelty to a juvenile which forms a predicate for the Second Degree Murder indictment." This is not a circumvention of the Code of Evidence. While our Code of Evidence prohibits the use of evidence of other crimes or wrongful acts to prove the character of a person in order to show that he acted in conformity therewith, such evidence is admissible "when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." La.Code Evid. art. 404(B)(1). In other words, when the evidence is relevant and probative to establish the elements of the crime charged, it is not rendered inadmissible because it also constitutes evidence of other criminal acts. The notice of use of other crimes evidence required under La. Code Evid. art. 404(B) and State v. Prieur, *465 277 So.2d 126 (La.1973), is not mandated when the evidence is relevant and probative to establish the elements of the crime charged. The limitations of Article 404(B)(1) on the admissibility of "other crimes, wrongs, or acts" evidence apply to exactly thatother crimes, wrongs, or actsand not to the crime charged. State v. Duncan, XXXX-XXXX, p. 11 (La.App. 1st Cir.9/27/02), 835 So.2d 623.
La.C.Cr.P. art. 487 allows the amendment of an indictment at any time with regard to a defect of form and provides that "before the trial begins the court may order an indictment amended with respect to a defect of substance." Determination of whether the court erred in allowing the amendment of the indictment is made by considering whether the defendant was prejudiced. Defendant had sufficient notice of the state's intention to prove cruelty to a juvenile to prepare a defense. A letter confirming the amendment of the bill of indictment was faxed to defense counsel on September, 26, 2001. Also, the state had previously given the defendant the statements and evidence that supported the amendment in discovery.
As previously noted, the second degree murder indictment in this case was based upon the killing of Chantell during the commission of cruelty to a juvenile, even though the defendant had no intent to kill or to inflict great bodily harm. Under La. R.S. 14:93, in order to prove cruelty to a juvenile, the state was required to show that the defendant intentionally or with criminal negligence abused or neglected Chantell, and caused her unjustifiable pain or suffering, and ultimately, death. Based upon the condition of the victim's body at the time of death, Dr. DeFatta, a medical expert, concluded that the victim had been deprived of proper nourishment and battered over an extended period of time. Dr. DeFatta opined that the malnourishment and beatings led to the child's weakened condition and made her especially susceptible to death from hypothermia. Because the prior acts of abuse were alleged to have contributed to the victim's demise, evidence of such were relevant and material in this second degree murder prosecution.
Since the date of the offense is not an essential element of the crime, and since defendant understood or should have understood that the alleged acts of cruelty to Chantell occurred on many occasions over a prolonged period of time, the trial court did not err in allowing the state to amend the bill of indictment. We find no error in the trial court's denial of the defendant's motion to quash the indictment This assignment of error lacks merit.

ASSIGNMENT OF ERROR 3
In his third assignment of error the defendant contends the trial court erred in allowing evidence of prior abuse and/or neglect of the victim. Defendant urges that this evidence was highly inflammatory and any probative value of the evidence was greatly outweighed by its prejudicial effect.
Prior to trial, the defendant filed a motion in limine seeking to exclude, among other things, any evidence of abuse and/or neglect of the victim. He argued that such evidence was irrelevant and highly inflammatory. The trial court denied the motion. Defendant filed a supervisory writ application with this court seeking review of the trial court's ruling on the motion in limine. In an unpublished decision, this court denied the writ application. State v. Booker, XXXX-XXXX (La.App. 1st Cir.1/18/02). Defendant then filed a supervisory writ application with the Supreme Court, which also was denied. State v. Booker, XXXX-XXXX (La.1/22/02), 806 So.2d 659.
*466 Although a pretrial determination of the admissibility of evidence does not absolutely preclude a different decision on appeal, judicial efficiency demands that this court accord great deference to pretrial decisions unless it is apparent, in light of a subsequent trial record, that the determination was patently erroneous and produced an unjust result. State v. Johnson, 438 So.2d 1091, 1104-1105 (La.1983). State v. Humphrey, 412 So.2d 507, 523 (La.1982) (on rehearing).
By this assignment of error, defendant again seeks review of the trial court's ruling denying his motion in limine. The assignment of error presents no new argument. The record in this case fully supports our previous decision on the issue presented in the writ application and is devoid of any additional evidence that would lead us to change the conclusion we reached therein. Accordingly, for the reasons cited in the previous assignment of error, we maintain our previous finding that the evidence of abuse and/or neglect of the victim in this case was relevant and admissible. This assignment of error is without merit.

ASSIGNMENT OF ERROR 4
In his fourth assignment of error, the defendant argues that the trial court erred in allowing the jury to view autopsy photographs of the victim. He asserts that the photographs had no probative value or relevance because the cause of death was hypothermia, which did not require a photograph to show or prove. The defendant argues that the photographs, depicting various unrelated bruises and scars, were cumulative, highly inflammatory, unduly prejudicial, and had "nothing to do with the cause of death of the child." The defendant contends the prejudicial effect of the photographs outweighed any marginal relevance, and thus the trial court committed reversible error in allowing the photographs to be introduced into evidence. In response, the state avers that the pictures were properly admitted, as they were necessary to illustrate the severe abuse suffered by the victim.
La.Code Evid. art. 403 provides that otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. Photographs that illustrate or shed light upon any fact or issue in the case or that are relevant to describe the person, place, or thing depicted, are generally admissible, provided their probative value outweighs any prejudicial effect. State v. Steward, 95-1693, p. 5 (La.App. 1st Cir.9/27/96), 681 So.2d 1007, 1011. The state is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as location and placement of wounds, and to provide positive identification of the victim. State v. Koon, 96-1208, p. 34 (La.5/20/97), 704 So.2d 756, 776, cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997). The trial court's admission of photographs will not be overturned on appeal unless the reviewing court finds that the photographs are so inflammatory as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Berry, 95-1610, p. 16 (La. App. 1st Cir.11/8/96), 684 So.2d 439, 454, writ denied, 97-0278 (La.10/10/97), 703 So.2d 603.
The autopsy photographs in this case were introduced in connection with medical testimony regarding the cause of the victim's death. Dr. DeFatta, the deputy coroner who performed the autopsy, stated *467 in his autopsy report and at trial, that as a result of the Battered Child Syndrome and the malnutrition, Chantell's immune system was very low and that she was "susceptible to things that normally any of us can fight off." He stated that evidence of severe abuse and malnourishment was readily visible upon inspection of the victim. In explaining the victim's death from hypothermia, Dr. DeFatta testified, "[t]his child certainly didn't have a chance to survive the cold temperatures in her badly beaten and malnourished state." Therefore, it is clear that, despite the defendant's contentions to the contrary, the autopsy photographs depicted injuries directly related to the cause of death of the victim. Thus, the photos were highly probative to show the physical condition that contributed to the victim's death. The photographs, showing the extensive bruises, scars, and ligature marks over the four-year old victim's tiny body, were relevant to illustrate the "badly beaten and malnourished state" that made the victim especially susceptible to death by hypothermia. We agree with the trial court's conclusion that the evidentiary value of the photographs outweighed any potential prejudice. The photos were properly admitted into evidence. This assigned error is without merit.

ASSIGNMENT OF ERROR 5
In his fifth assignment of error, the defendant contends the trial court erred in overruling his objection to the opening statement of the prosecutor. The portion of the opening statement of which the defendant specifically complains is as follows: "Chantell Duncan turned four years old on December 17th of the year 2000. She did not have cake. She did not have a party." Immediately following this statement, counsel for the defendant objected, arguing that the statement was prejudicial, irrelevant, and designed to inflame the jury. In response, the prosecutor argued that the statement contained facts that were relevant to the abuse and neglect of the victim. The trial court overruled the objection finding that it was proper to provide a factual scenario to the jury in opening.
A mistrial is warranted when certain remarks are considered so prejudicial and potentially damaging to the defendant's rights that even a jury admonition could not provide a cure. State v. Edwards, 97-1797, p. 19 (La.7/2/99), 750 So.2d 893, 906, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999). However, mistrial is a drastic remedy and warranted only when substantial prejudice will otherwise result to the accused to deprive him of a fair trial. State v. Anderson, XXXX-XXXX, p. 19 (La.App. 1st Cir.3/28/01), 784 So.2d 666, 682, writ denied, XXXX-XXXX (La.4/19/02), 813 So.2d 421. A trial court's ruling denying a mistrial will not be disturbed absent an abuse of discretion. State v. Givens, 99-3518, p. 12 (La.1/17/01), 776 So.2d 443, 454.
We find no error in the trial court's overruling the defendant's objection to the statement indicating that Chantell did not have a birthday party. The statement merely provides a factual scenario, in this case, where the four year old victim died as a result of abuse and/or neglect inflicted upon her on the night of her birthday. Moreover, even if we were to find the comment erroneous, we do not find that it rose to the level of preventing a fair trial and warranting a mistrial. The trial court, while seated in the best position to evaluate the effect of the statement upon the jury, overruled defendant's objection to the statement. As a further precaution, the trial court, in its general jury charge, instructed the jurors to refrain from rendering a decision "influenced by sympathy, *468 passion, prejudice or public opinion." Therefore, we are not convinced that the jury was influenced by the prosecutor's comment or that the comment contributed to the verdict. This assignment of error lacks merit.

ASSIGNMENTS OF ERROR 6 AND 7
In these assignments of error, the defendant contends the trial court erred in instructing the jury on what constitutes second degree murder resulting from cruelty to a juvenile. He argues that because he was not the parent or legal guardian of Chantell, he was not legally responsible for the child, and thus cannot be criminally liable for neglect of the child. The defendant further argues that the trial court's jury charge on second degree murder during the commission of cruelty to a juvenile, under La. R.S. 14:93, erroneously suggested a legal responsibility where none exists. As an alternative argument, the defendant avers that La. R.S. 14:93 is unconstitutionally vague as applied in this case because it does not give adequate notice who may be criminally charged for the neglect of the child.
La. R.S. 14:93 provides, in pertinent part, as follows:
A. Cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age or seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense.
The Reporter's Comment to this article provides, in pertinent part:
Scope:
This section is intended to cover both the mistreatment of children and their neglect.
The section does not limit criminal responsibility to the parent or guardian, and thus anyone may commit the crime. But as the (sic) neglect it logically follows that only one with legal responsibility towards a child can be held for criminal neglect.
What constitutes a neglected child:
The present Louisiana statutes which determine the jurisdiction of the juvenile courts lay down the rules as to what constitutes a neglected child; it is intended that these same rules be used in interpreting this section. See Acts 1921 (E.S.), No. 83, § 6 (neglected child defined); Acts 1924, No. 30, § 9 (neglected child defined); Acts 1921 (E.S.), No. 126, § 3 (neglected child defined).
In response to a pretrial motion to quash, the trial court ruled on the applicability of La. R.S. 14:93. The trial court found La. R.S. 14:93 applicable to this defendant under the facts and circumstances of this case. In its reasons for judgment, the trial court noted that while the reporter's comments to La. R.S. 14:93 suggest it is logical that one who is not legally responsible for a child should not be convicted of neglect, the comment also suggests that the laws governing the jurisdiction of the juvenile court should be consulted to determine what constitutes a neglected child. Under La. Ch.Code art. 603(14), "neglect" is the refusal or unreasonable failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health and safety is substantially threatened or impaired. La. Ch.Code art. 603(3) defines "caretaker" as any person legally obligated to provide or secure adequate care for a child, including a parent, tutor, guardian, legal custodian, foster home parent, an employee *469 of a public or private day care center, or other person providing a residence for the child.
Citing State v. Morrison, 582 So.2d 295 (La.App. 1st Cir.1991) and State v. Porter, 99-1722 (La.App. 3rd Cir.5/3/00), 761 So.2d 115, the trial court found that the defendant, the grandfather of the victim with whom the victim and her mother were residing, is someone who may be found guilty under La. R.S. 14:30.1(A)(2)(b) of second degree murder during the perpetration of cruelty to a juvenile through criminal negligence. In Morrison, the trial court found that a live-in-boyfriend of the victim's mother, intentionally or through his criminal negligence, committed cruelty to a juvenile. In Porter, the court did not explain the defendant's relationship to the child, but did identify the mother specifically. The court stated that in order for the state to prove the defendant guilty of second degree murder it must show either (1) that the defendant intentionally mistreated or neglected the child, or (2) that the defendant was criminally negligent in his mistreatment of the child. State v. Porter, 99-1722 at p. 19, 761 So.2d at 125.
The evidence presented at trial in this case clearly proves that, with the exception of a few days, Kenisha and Chantell lived with the defendant from the time Chantell was born until the time she died. Outside of merely supplying shelter for Kenisha and Chantell, the defendant, by his own testimony, indicated that he was also responsible for disciplining and providing for the child. Under La. Ch.Code art. 603(14), the legal responsibility of providing necessary food, clothing, shelter, and care does not end with the parent. The statute also includes caretakers in its list of responsible persons. As previously noted, a caretaker is, among other persons, "any person...providing a residence for the child." La. Ch.Code art. 603(3). As a person providing residence to Chantell at the time of her death and for most of her short life, the defendant clearly meets the definition of a caretaker. As a caretaker of the minor child, the defendant was, along with the child's mother, legally obligated to supply the child with food, clothing, shelter and care. Failure to fulfill this legal responsibility could result in the defendant being charged with, and possibly convicted of, cruelty to the juvenile based upon criminal negligence. La. R.S. 14:93.
Medical testimony at trial showed that Chantell's growth was significantly stunted by starvation and malnourishment. Medical records introduced into evidence at trial reflect that at two years old, Chantell weighed 23 pounds, at three years old, 24 pounds, and at the time of her death (four years old), Chantell weighed only 25 pounds. Medical expert testimony established that at the time of her death, Chantell showed various signs of malnourishment including a distended abdomen and little or no body fat. Testimonial evidence at trial also established that, despite the freezing temperatures, Chantell was found clad in a sleeveless top and shorts. Thus, it is clear that while in the care of her mother and her grandfather, Chantell did not receive sufficient food, clothing or care.
For the foregoing reasons, we find no error in the trial court's conclusion that the defendant could be considered a person legally responsible for Chantell's health and well-being. The court properly considered the statutory definitions of "neglect" and "caretaker", as provided in La. Ch.Code art. 603, in determining the scope of La. R.S. 14:93. Likewise, we find no error in the trial court's instructing the jury on what constitutes second degree murder resulting from cruelty to a juvenile. These assignments of error lack merit.

*470 ASSIGNMENT OF ERROR 8

In his final assignment of error, the defendant urges that the errors complained of in this appeal are not harmless and thus, warrant reversal of his conviction and sentence. After a thorough review of the record and consideration of all of the assigned errors, we have found no error. Absent a finding of error, there can be no prejudice to defendant. This assignment of error also lacks merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Judge Ian W. Claiborne, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The indictment also charged the victim's mother, Kenisha Duncan, with the same offense. On motion of Timothy Booker, the co-defendants were severed for purposes of trial.