**NOT DESIGNATED FOR PUBLICATION**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2022 KA 1012

STATE OF LOUISIANA

VERSUS

ANGEL GALVAN-PAZ

Judgment Rendered: **FEB 2 4 2023**

* * * * * * *

On Appeal from the 17th Judicial District Court
In and for the Parish of Lafourche
State of Louisiana
Trial Court No. 595611

Honorable F. Hugh Larose, Judge Presiding

* * * * * * *

Kristine Russell
District Attorney
Joseph S. Soignet
Jason Chatagnier
Assistant District Attorneys
Thibodaux, Louisiana

Attorneys for Appellee,
State of Louisiana

Lieu T. Vo Clark
Madisonville, Louisiana

Attorney for Defendant/Appellant,
Angel Galvan-Paz

* * * * * * *

BEFORE: WELCH, PENZATO, AND LANIER, JJ.

**PENZATO, J.**

The defendant, Angel Galvan-Paz, was charged by an amended bill of information with second degree cruelty to juveniles, a violation of La. R.S. 14:93.2.3. He pled not guilty and, following a jury trial, was found guilty as charged. The trial court sentenced the defendant to twenty-five years imprisonment at hard labor. The defendant filed a motion to reconsider sentence, which the trial court denied. The defendant now appeals, assigning error to the sufficiency of the evidence, the constitutionality of the sentence, and the denial of his motion to reconsider sentence. For the following reasons, we affirm the conviction and sentence.

## STATEMENT OF FACTS

On February 22, 2020, Captain Walter Theriot, then a patrol deputy with the Lafourche Parish Sheriff's Office (LPSO), was dispatched to 211 West 64th Street in Cutoff, Louisiana. The dispatch was in response to a medical call regarding a four-month-old infant child, C.M., the victim,[1] falling out of a vehicle. Captain Theriot testified that when he arrived at the residence, he was informed that C.M. did not fall out of a vehicle, but instead fell out of a baby swing approximately eight to twelve inches off the ground. Captain Theriot observed as C.M. was examined by Lafourche Ambulance Services. The emergency examiner noted possible abuse. Captain Theriot observed C.M.'s injuries, including bruising to his stomach and arm, and further noted that C.M. was in pain and crying. Captain Theriot referred the case to the juvenile division of the LPSO. C.M. was taken by ambulance to Children's Hospital in New Orleans.

The next day, February 23, 2020, Detective Teresa Gatica with the juvenile division of LPSO was assigned to the case. She went to Children's Hospital where

---

[1] Herein, we will refer to the victim, his mother, and his siblings by their initials only. See La. R.S. 46:1844(W). *State v. Mangrum*, 2020-0243 (La. App. 1st Cir. 2/22/21), 321 So.3d 986, 989 n.1, writ denied, 2021-00401 (La. 10/1/21), 324 So.3d 1050.

she conducted interviews of C.M.'s parents, the defendant and L.M.[2] Detective Gatica advised them of their *Miranda*[3] rights prior to questioning, and they each waived their rights. L.M. informed Detective Gatica that she left for work at 8:00 a.m. on the morning of the incident. When she was returning home that night, the defendant called her and stated that their son's arm was stuck or that he had dropped the child. L.M. further told Detective Gatica that she initially thought the defendant was joking, as he had done in the past, to get her to come home quicker. Due to traffic from a Mardi Gras parade, L.M. arrived home after 10:00 p.m. L.M. informed Detective Gatica that when she saw C.M., she observed that his arm appeared broken or limp. L.M. further stated that the defendant initially did not want to tell her what happened because he believed she would be upset with him. She said he eventually told her that C.M. was injured when he fell from a baby swing, but later told her that C.M. was injured when his two-year-old sister stepped on his arm. L.M. said she contacted a family member and asked them to call the paramedics.

When Detective Gatica subsequently interviewed the defendant, the defendant indicated that the accident occurred when he and C.M.'s two-year-old sister were walking down the outdoor steps of his trailer.[4] The defendant stated that his daughter slipped while going down the steps, and he grabbed her to prevent her from falling. In doing so, he tilted the car seat in which he was carrying C.M., and C.M. fell about a foot in distance, from the car seat down to the steps. The defendant told Detective Gatica that he did not initially believe C.M. was seriously injured.

Detective Gatica subsequently received C.M.'s medical records from the Department of Children and Family Services. The records indicated that in addition

---

[2] The defendant and L.M. only spoke Spanish. Detective Gatica spoke both Spanish and English. Interpreters were used during other pretrial interviews and during the trial testimony of L.M. and the defendant.

[3] See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[4] Detective Gatica later went to the defendant's trailer and took photographs of the outdoor steps.

to a fractured arm, C.M. had "non-accidentally [sic] trauma," also described as "blunt trauma," including parietal skull fracture, right humerus fracture, right femur fracture, a grade-three liver laceration, and bruising. After medical staff informed Detective Gatica and her division that C.M.'s injuries could not have occurred as the defendant described, they pursued charges against the defendant and L.M. for cruelty to juveniles.

## SUFFICIENCY OF THE EVIDENCE

In assignment of error number one, the defendant argues that the circumstantial evidence presented at trial did not exclude every reasonable hypothesis of innocence and was insufficient to convict him of second degree cruelty to juveniles. Thus, he contends the State failed to meet its burden of proof. He notes there was no testimony or evidence that he had a history of abusing his children. He argues that Dr. Paige Culotta, an expert in child abuse pediatrics who testified that a fall would not explain all of C.M.'s injuries, was unaware of all the details of the fall suffered by C.M. The defendant notes that in addition to being the only adult present when C.M. fell out of the car seat, he did not see how C.M. fell, as he was assisting his toddler, who slipped as they were going down the steps outside of his trailer. The defendant notes that Dr. Culotta clarified that a fall onto concrete could result in significant injuries. Thus, the defendant specifically argues the circumstantial evidence did not exclude the reasonable hypothesis of innocence that C.M.'s injuries were possibly caused by him falling from the car seat held by the defendant, rolling down two wooden steps followed by a concrete step, and then finally rolling into the grass.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

4

have found that the State proved the essential elements of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Ordodi*, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; *State v. Williams*, 2019-0077 (La. App. 1st Cir. 5/31/19), 2019 WL 2315340, *2, writ denied, 2019-01060 (La. 10/1/19), 280 So.3d 158. The *Jackson* standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. *State v. Patorno*, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. *State v. James*, 2017-1253 (La. App. 1st Cir. 2/27/18), 243 So.3d 717, 721, writ denied, 2018-0419 (La. 1/8/19), 259 So.3d 1024.

Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child. La. R.S. 14:93.2.3(A)(1). "Intentional," as used in the statute, refers to general criminal intent, present whenever there is specific intent, and also when circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. See La. R.S. 14:10(2); *State v. Staggs*, 2019-0110 (La. App. 1st Cir. 9/27/19), 2019 WL 4739247, *2, writ denied, 2019-01797 (La. 7/17/20), 298 So.3d 174. Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest

5

of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably prudent man under like circumstances. La. R.S. 14:12. "Mistreatment" as used in the statute is equated with abuse. *State v. Booker*, 2002-1269 (La. App. 1st Cir. 2/14/03), 839 So.2d 455, 459, writ denied, 2003-1145 (La. 10/31/03), 857 So.2d 476. Serious bodily injury is "bodily injury which involves unconsciousness; extreme physical pain; protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death." La. R.S. 14:2(C).

Lucas Bricknell was one of the paramedics with Lafourche Ambulance Services who examined C.M. at the scene. Mr. Bricknell testified that he was dispatched to the scene to provide emergency assistance to a child who fell a distance of approximately one foot, from a bouncy seat onto the floor, and possibly broke an arm as a result of the fall. When Mr. Bricknell arrived at the scene, a firefighter approached him with C.M. and also indicated that C.M. had fallen and possibly broken his arm. Mr. Bricknell noted that C.M. had soiled clothing, which he described as "maybe dried food, you know, urine possibly feces." After removing clothing to expose C.M.'s arm, he observed bruising and deformity while taking C.M.'s brachial pulse. He heard crepitus, a crunching sound sensation of a bone that is fractured. Thus, the paramedics secured a pediatric arm board as a splint for the injured extremity. Mr. Bricknell described C.M.'s demeanor as "overly calm" and noted that he was not crying at the time, adding, "usually if you take a child that age away from a parent they are very fussy, crying." Mr. Bricknell contacted Louisiana Emergency Response Network and, as instructed, transported C.M. to Terrebonne General Medical Center. Based on his experiences as an EMS provider, Mr. Bricknell concluded that the injuries he noted were not consistent with a fall from a short distance.

L.M., C.M.'s mother, testified at trial. She stated she was originally from

Honduras, where she met the defendant, and had been living in Louisiana for five years. She and the defendant have three children together, C.M. and his two older sisters, E.M. and A.M., who were six and two years of age, respectively, at the time of the incident in question. They lived together in a trailer along with L.M.'s mother and sister. The defendant lost his job on or near February 2, 2020, and began watching the children while L.M., her mother, and her sister worked at a grocery store. Later that month, on the day in question, L.M., her mother, and her sister went to work. E.M., C.M.'s oldest sibling, also left that morning to attend a church function. L.M. further testified that when she saw C.M. that morning before she left for work, he was fine and did not have any broken bones to her knowledge. However, L.M. noted that C.M. had "two little bruises" on his stomach, which she explained as being "fingers marked" by the defendant because of the way he held C.M. L.M. further stated, "[t]hat's the only thing that had worried me, and I called him on it." She later explained that while the defendant played with the children, he held C.M. in such a manner that caused the bruises on his stomach, responding positively when asked if the defendant was playing the "airplane game[.]"

L.M. further testified that when she was on her way home, around 9:30 p.m., the defendant called her and told her that C.M. fractured his arm. She initially terminated the call and continued navigating through traffic. When she called the defendant back, he told her that their two-year-old daughter, A.M., had fallen on top of C.M. L.M. noted that when she, her mother, and her sister arrived home, her mother picked up C.M. L.M. cried as she observed that C.M.'s arm was "loose, was off where it was supposed to be." As L.M. does not speak English, she called her aunt and her cousin, who called for an ambulance. L.M. admitted to and apologized for lying to ambulance personnel in initially claiming that she dropped her son. She explained that she lied because she was nervous, had an issue with immigration, and was afraid to admit that she had left her son alone with the defendant. She repeated

7

the lie when she arrived at the hospital and spoke to a doctor. She testified that she did not in fact injure or harm C.M. despite her previous statements. At the hospital, she observed additional injuries, including bruises on C.M.'s back and head. She noted that C.M. was taken by ambulance to a hospital in New Orleans.

L.M. testified that the doctors in New Orleans informed her that C.M. had injuries to his head, arm, wrist, stomach, and liver. When one of the doctors in New Orleans asked L.M. what happened with C.M., she asked for forgiveness for lying and stated that C.M. had been with the defendant that day and that she did not know what happened. L.M. subsequently questioned the defendant and the defendant ultimately told her that he dropped C.M. on the steps. L.M. gave this information to detectives and the Department of Children and Family Services, relaying the defendant's revised explanation but reiterating that she did not know what happened. She denied ever seeing the defendant abuse any of their three children. She further testified that she had taken C.M. to see his pediatrician since he was born, noting that he appeared to have asthma, and she brought him to have medical care every time he needed it.

Anjuli Leblanc, a child welfare investigator with the Department of Children and Family Services at the time of the incident, testified at trial. She noted that the department received a call on February 22, 2020, regarding C.M.'s hospitalization at Children's Hospital in New Orleans and suspected abuse. In beginning her investigation, Ms. Leblanc received an initial report from Children's Hospital stating that there was evidence of non-accidental trauma such as skull fracture and broken bones. On February 24, 2020, Ms. Leblanc went to see C.M. in the hospital and observed that he had a cast on his right arm in its entirety that secured his arm to his body, and that a harness that held his feet in a seated position was attached to his chest. She further observed bruises of various stages on his lower chest, upper abdomen, right thigh, and lower back along the spine. Based on her experience, she

8

considered C.M.'s injuries to be indicative of suspected child abuse.

Ms. Leblanc testified that she interviewed the defendant, and he gave inconsistent stories as to how C.M. was injured, including claims that C.M. fell from a bouncer, fell from a table, fell out of a car seat while going down the steps of the home, and that E.M. fell over on him and A.M. pushed him. The defendant said he was nervous about what to tell L.M. in regards to C.M.'s injuries. Ms. Leblanc testified that the defendant was calm but nervous during the interview. Consistent with L.M.'s trial testimony, Ms. Leblanc later learned that E.M. was not home during the incident. According to Ms. Leblanc, L.M. informed Ms. Leblanc that she was at work that day and observed C.M.'s injuries when she got home that evening.

Dr. Culotta, the aforementioned child abuse pediatrician at Children's Hospital in New Orleans, testified as an expert in child abuse pediatrics. Dr. Culotta evaluated C.M. on February 23, 2020, after being contacted by another doctor who was concerned about physical abuse. Dr. Culotta interviewed the defendant and L.M. by telephone. Dr. Culotta testified that L.M. told her that the defendant told L.M. that C.M.'s two-year-old sibling fell on him, but confirmed that she did not know what happened because she was at work at the time. The defendant told Dr. Culotta that C.M. fell out of the car seat when he tried to help his daughter, who almost fell when going down the steps outside of the trailer. The defendant was not sure exactly how C.M. fell but believed that he hit his head on the first step and then rolled onto the grass. He did not notice C.M. hit any other part of his body when he fell and did not see anything wrong with him after the fall. Dr. Culotta testified that the defendant said he gave C.M. a bottle after the fall, C.M. consumed three ounces, and then fell asleep. When he woke up, his arm was limp and appeared swollen, and he cried continuously.

In physically examining C.M., Dr. Culotta noted swelling to the left parietal scalp and a circular bruise on the left side of his chest. She further noted that he had

9

a cast on his right arm and a harness in place to his legs, abrasions on the back of his hand, and a small scar on the side of his right leg. C.M.'s lab work showed that he had elevated liver enzymes and a CT scan of his belly showed a grade-three liver laceration. An x-ray of C.M.'s arm showed a comminuted fracture of the distal humoral diaphysis. His arm was splinted, with mild lateral displacement and deformity. Dr. Culotta noted that the term "comminuted" means that there could be a separate piece of bone or also indicates "more force," meaning that it was more than just a typical break. She noted the concern of a "twisting force" or "grab and a twist" regarding such injuries, though she did not see pieces of bone on the x-ray.[5] Dr. Culotta confirmed that C.M.'s head injury was on the left side, but his arm fracture was on the right side of his body. She noted that it was a concern when babies have injuries on different planes of their body.

Dr. Culotta diagnosed C.M. with child physical abuse. She testified that her diagnosis was based on her concerns with each of the injuries in the report. She specifically noted that C.M. was a four-month-old male presenting with a concern for physical abuse due to multiple injuries that had been identified and not explained by the history. In that regard, she further noted that the history provided by his parents did not match C.M.'s injuries. She concluded that a fall from a car seat onto stairs would not have caused all three of the major injuries, the right arm fracture, the left skull fracture, and the grade-three liver laceration on the right side, which meant that his liver was hit so hard and fast that it burst. Additionally, C.M. had bruises to his chest and in the middle of his back. She testified, "[s]o my conclusion was that a fall from the car seat as it was described does not explain the entirety of his injuries." In describing a fall such as the one alleged, Dr. Culotta noted that if a baby falls and first hits his head on the stairs, then that is probably where there would

---

[5] In this regard, Dr. Culotta noted that she is not a radiologist, conceding that a radiologist would "give the best description" of the x-ray images.

be an injury. Once the child starts to roll or if they go down another stair or a couple of stairs, each of those additional falls is only a matter of inches and they typically will not get multiple injuries from stair falls.

The defendant testified at trial that on the evening in question, C.M.'s six-year-old sister, E.M., was not home, but his two-year-old sister, A.M., who was home, was hungry, and there was no food in the house. The defendant called a friend and asked him to pick them up to get pizza. He confirmed that he changed C.M.'s diaper and put C.M. in his car seat, but did not buckle him into the carrier. He stated that he grabbed A.M.'s hand with his left hand, grabbed C.M. with his right hand, and went out of the trailer. According to the defendant, as he was going down the steps, A.M. tripped and fell. When she was falling, he grabbed her, and in doing so, he slipped down and ended up sitting on the second-to-last wooden step. When he fell to a sitting position, the car seat tilted and C.M. fell. The defendant noted that he did not see exactly how C.M. fell because he was looking at A.M. at the time, but noted that C.M. landed in the grass.

The defendant stated that he picked up C.M., who was crying, and "his arm was twisted behind him." The defendant took him inside and gave him a bottle, and he fell asleep. The defendant testified that he did not know that C.M.'s arm was fractured. The defendant denied ever abusing or beating his children and referred to his failure to strap C.M. into the car seat as "the worst mistake I've ever committed as a parent[.]" The defendant confirmed that he never called for emergency care. However, he testified that he realized that C.M.'s arm was fractured within fifteen minutes of laying him down, when he began crying.

Dr. Amanda Rogers, a family medicine physician, testified as an expert in family medicine. On October 29, 2019, Dr. Rogers treated C.M. when L.M. brought him to the doctor due to her concerns about forceful spit up. Dr. Rogers ordered an ultrasound of C.M.'s abdomen to determine if he had either pyloric stenosis or only

11

normal baby reflux. L.M. brought C.M. back the next day for the ultrasound, which produced normal results. Dr. Rogers determined that the spitting up was caused by overfeeding and counseled L.M. regarding the appropriate amount of milk to give C.M. at one sitting. She did not see any signs of abuse or neglect or have any developmental concerns. Dr. Rogers wrote a letter confirming that L.M. brought C.M. to be seen by the Kid Med nurse on November 1, 2019, and January 29, 2020, for checkup and shots. There was no mention of suspicion of neglect or abuse as to those visits. Nurse Brandy Guidry, a Kid Med nurse, similarly testified that C.M. had no issues or problems when she saw him, and she had no concerns of abuse or neglect.

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. *State v. Taylor*, 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See *State v. Mitchell*, 99-3342 (La. 10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. *State v. Quinn*, 479 So.2d 592, 596 (La. App. 1st Cir. 1985). See *State v. Weary*, 2003-3067 (La. 4/24/06), 931 So.2d 297, 311-12, cert. denied, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006).

In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is

sufficient to support a factual conclusion. *State v. Higgins*, 2003-1980 (La. 4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). An appellate court errs by substituting its appreciation of the evidence and credibility of the witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the trier of fact. See *State v. Calloway*, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).

We note that the defendant told inconsistent stories before ultimately indicating that C.M.'s injuries were caused by an accidental fall down a set of steps. Lying has been recognized as indicative of an awareness of wrongdoing. *State v. Captville*, 448 So.2d 676, 680 n.4 (La. 1984); *State v. Chesterfield*, 2016-1570 (La. App. 1st Cir. 6/2/17), 2017 WL 2399029, *6, writ denied, 2017-1210 (La. 4/27/18), 241 So.3d 310. Considering the discrepancies among the defendant's various explanations for C.M.'s injuries, the jury could have concluded that his lies were an indication of guilt. Moreover, the jury heard, and rejected, the defendant's ultimate theory that all of C.M.'s injuries were caused by an accidental fall on the steps. In reviewing the evidence, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See *Ordodi*, 946 So.2d at 662. Based on the evidence presented in this case, the jury could have rationally concluded that the defendant committed intentional, or at the very least, criminally negligent mistreatment of his four-month-old son. Viewing the evidence in the light most favorable to the State, we are convinced that any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of second degree cruelty to juveniles. See *Calloway*, 1 So.3d at 418. Thus, we find no merit in assignment of error number one.

## EXCESSIVE SENTENCE

In a combined argument for assignments of error numbers two and three, the defendant argues the sentence is unconstitutionally excessive and that the trial court erred in denying his motion to reconsider sentence. He notes that he has no reported history of child abuse or a prior criminal history. He further notes that C.M.'s mother testified that when he was working, he was the sole provider of financial support for his children. He argues "[t]he evidence at best shows that he was perhaps neglectful in failing to buckle his baby into the car seat prior to transporting him," conceding the jury may have relied on this prong of the statute to convict him. He concludes that a twenty-five-year sentence for the facts presented in this case is nothing more than a needless infliction of pain and suffering.

The Eighth Amendment to the United States Constitution and Article I, Section 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence may be within statutory limits, it may violate a defendant's constitutional right against excessive punishment and is subject to appellate review. *State v. Sepulvado*, 367 So.2d 762, 767 (La. 1979); *State v. Honea*, 2018-0018 (La. App. 1st Cir. 12/21/18), 268 So.3d 1117, 1120. A sentence is constitutionally excessive if it is grossly disproportionate to the severity of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. *State v. Hurst*, 99-2868 (La. App. 1st Cir. 10/3/00), 797 So.2d 75, 83, writ denied, 2000-3053 (La. 10/5/01), 798 So.2d 962.

Louisiana Code of Criminal Procedure article 894.1 sets forth the factors for the trial court to consider when imposing sentence. While the entire checklist of Article 894.1 need not be recited, the record must reflect that the trial court adequately considered the criteria. In light of the criteria expressed by Article 894.1,

14

a review for individual excessiveness should consider the circumstances of the crime and the trial court's stated reasons and factual basis for its sentencing decision. *State v. Brown*, 2002-2231 (La. App. 1st Cir. 5/9/03), 849 So.2d 566, 569. Remand is unnecessary when a sufficient factual basis for the sentence is shown. *State v. Lanclos*, 419 So.2d 475, 478 (La. 1982); *State v. Graham*, 2002-1492 (La. App. 1st Cir. 2/14/03), 845 So.2d 416, 422.

Whoever commits the crime of second degree cruelty to juveniles shall be imprisoned at hard labor for not more than forty years. La. R.S. 14:93.2.3(C). The defendant was sentenced to twenty-five years at hard labor, which is less than the maximum allowed sentence. We note that the injuries suffered by C.M. indicate physical force was used against him. Just prior to the imposition of sentence, defense counsel asked the trial court to consider the defendant's lack of any criminal history, thus the trial court was aware of that factor. In sentencing the defendant, the trial court noted its consideration of the sentencing guidelines. The trial court further noted that the injuries suffered by C.M. were "horrific." The trial court further stated, "[a] four-month-old child presents no ability to defend itself, to ask for mercy, or to remove itself from danger. It is particularly difficult for the Court to understand how the father of this child could perpetrate such a crime upon his own son." The court found that during the period of any suspended sentence, the defendant would present an undue risk of harm to C.M.; that the defendant was in need of correctional treatment or a custodial environment that could be provided most effectively by his commitment to an institution; and that a lesser sentence would deprecate the seriousness of the defendant's crime. We further note that the the defendant knew or should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to extreme youth. See La. Code Crim. P. art. 894.1 (B)(2).

We find that the imposed sentence is not grossly disproportionate to the

severity of the offense, and therefore, was not unconstitutionally excessive. Thus, we find no error in the trial court's denial of the defendant's motion to reconsider sentence. Accordingly, we find no merit in assignments of error numbers two and three.

**CONVICTION AND SENTENCE AFFIRMED.**